UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| TIMOTHY L. JONES, KATHY JONES, and RTJ SERVICES, LLC | ) ) ) | |
| Plaintiffs, | ) ) | Civil No. 10-96-GFVT |
| V. | ) ) | |
| THE BANK OF HARLAN, | ) ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) ) ) ) ) | |

*** *** *** ***

Beginning on October 12, 2011, the parties in the above suit began filing a series of motions to enforce various versions of a settlement agreement, responses to those motions, and corresponding replies. [*See* R. 58; R. 59; R. 60; R. 61; R. 63]. The underlying dispute involves an alleged breach of a loan agreement, but the issue before the Court now is whether the parties' communications constitute an enforceable settlement, and if so, exactly what the terms of that settlement are. Because the Court agrees that an enforceable settlement was reached, and that the terms of that settlement exist as argued by the Plaintiffs, their motion to enforce the settlement will be granted.

**I.**

The issue before the Court now is purely a question of contract. The underlying dispute is of little significance other than how it influences the parties' expectations and communications while negotiating the potential settlement. Thus, a recitation of all the facts which form the basis of the initiation of the lawsuit is unnecessary. It is enough to say that the Plaintiffs (hereafter

1

referred to collectively as "RTJ") and the Defendant ("the Bank") had an agreement whereby the

Bank loaned money to RTJ and RTJ still owed money to the Bank on those loans.

After eighteen months of litigating that dispute, the parties had a series of

communications that each thinks constitutes an enforceable settlement, although they disagree as

to what the terms are of that settlement.  The key communication was an email from Keith

Moorman, counsel for the Bank, to Larry Zielke and Nancy Schook, counsel for RTJ.  The email

was sent on September 16, and reads in its entirety:

> Larry and Nancy, in response to your most recent settlement demand, I have been authorized by the Bank to reject your demand, but to counter as follows:
>
> In exchange for a release of any and all claims the plaintiffs have or may have against the Bank, and a release of any and all claims the Bank has or may have against RTJ, or against Tim and/or Kathy Jones in regard to RTJ:
>
> 1.      The Bank will agree to split the proceeds of the CD 50-50;
>
> 2.      The Bank will accept a transfer of all outstanding notes and accounts receivable of RTJ in exchange for the Bank forgiving all indebtedness it holds in the name of RTJ;
>
> 3.      Tim and Kathy Jones shall remain liable for all indebtedness they have to the Bank for loans made by the Bank in Tim and Kathy's names or in any name other than RTJ;
>
> 4.      The settlement must be reduced to writing with such other terms as are acceptable to all parties.
>
> Let me know if you have any questions.  This is an offer of settlement subject to protection against impermissible disclosure.

[R. 58, Ex. A].  Nancy Schook's entire responsive email on September 19 states:

> "Keith:  my client's [*sic*] agree to ACCEPT the bank's offer set forth below.  Please draft up the necessary settlement documents, and please advise the Court of the settlement.  The check for the 50% of the CD proceeds should be payable to Zielke Law Firm, PLLC.  Our tax ID # is . . . .  Look forward [*sic*] to getting this wrapped up and over."

[*Id*.].

The main dispute between the parties centers on the language at number "2" in the Bank's initial email, "The Bank will accept a transfer of all outstanding notes and accounts receivable of RTJ . . . ." [R. 58, Ex. A]. RTJ contends that this means the Bank has a right only to RTJ's outstanding notes and accounts receivable as of the date of the offer. [R. 58 at 3]. The Bank argues that it has a right to money RTJ collected on RTJ accounts prior to the offer because accounts "meant accounts in all forms, including proceeds generated from the accounts." [R. 59 at 9]. In other words, RTJ contends that the Bank only has a right to money that was unpaid and owed to RTJ on September 16, while the Bank argues that it has a right to money RTJ had collected on its accounts prior to that date.

As further support for its position the Bank also argues that "a comprehensive written agreement was a condition of settlement" [R. 63 at 1] because of the language at number "4" in the initial email, "The settlement must be reduced to writing with such other terms as are acceptable to all parties." [R. 58, Ex. A]. Because of this, the Bank argues, the emails do not form a valid contract at all; it is the creation of a written agreement that creates a valid contract. Each of these arguments will be addressed in turn.

## II.

"It is well established that courts retain the inherent power to enforce agreements entered into in settlement of litigation pending before them." *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1371 (6th Cir. 1976). However, "[b]efore enforcing a settlement, a district court must conclude that agreement has been reached on all material terms." *Re/Max International Inc. v. Realty One, Inc.*, 271 F.3d 633, 645-46 (6th Cir. 2001). In many situations, a court should conduct an evidentiary hearing to determine whether agreement was reached.

That is not the case though, when, as here, it is not the facts that the parties are in

disagreement about, but rather the legal meaning of their communications. *See id.* at 646 ("[N]o evidentiary hearing is required where an agreement is clear and unambiguous and no issue of fact is present"). In other words, no one is arguing about whether the communications occurred. They exist in written form, plain to see and very different from, for example, communications that may give rise to an oral contract. That is the type of communication which may require a hearing, not written and unaltered emails. In a similar case before a district court elsewhere in this circuit, that court was correct when it stated that because there was "substantial written documentation of the parties' communications regarding the settlement agreement, the validity and accuracy of which the parties [did] not dispute, it [was] unnecessary for the court to conduct a hearing." *Anglo-Danish Fibre Industries v. Columbian Rope Co.*, No. 01-2133 GV, 2002 WL 1784490, at *4 (W.D. Tenn. June 21, 2002).

Thus, it is within the Court's power to interpret and enforce, or not enforce, the communications between the parties. In addition, the Court may interpret those communications without first conducting an evidentiary hearing.

### III.

### A.

The Bank argues that the email communications, *supra*, did not form a contract because of the language in its September 16 email that "[t]he settlement must be reduced to writing with such other terms as are acceptable to all parties." [R. 58, Ex. A]. According to the Bank, the presence of this language means that the parties intended to condition the formation of a settlement contract on the completion of a more comprehensive written settlement agreement.

This position is at odds with the law, however. "When parties have agreed on the essential terms of a settlement, and all that remains is to memorialize the agreement in writing,

4

the parties are bound by the terms of the oral agreement." *Re/Max International Inc.*, 271 F.3d at 646.  Here, there is no oral agreement, but rather a series of emails that is readily comparable to oral communications. If there is mutual assent in those emails, then the desire to memorialize the agreement in a more formal manner at a later time cannot negate the assent that existed at the crucial point that the contract was created.

"Where it was understood that the contract should be formally drawn up, and put in writing, the transaction is nevertheless complete and binding, absent a positive agreement that it should not be binding until so reduced to writing and formally executed.  This is the position adopted by both Restatements." 1 Williston on Contracts § 4:11 (4th ed. 2011).  If the Bank's email evinces a "positive agreement" not to be bound by the terms contained within it, then the Bank's argument that a formal memorialization of the agreement was a condition of contract formation would have merit.  "Ultimately, the question is one of fact as to the intention of the parties." *Id.*

Examining the September 16 email from the Bank, it contains two key sentences that belie the Bank's position.  First, at the beginning of the email, Bank counsel states "I have been authorized by the Bank to reject your demand, but to counter as follows . . . ." [R. 58, Ex. A]. Then, at the end of the email, counsel for the Bank states "This is an offer of settlement subject to protection against impermissible disclosure."  [*Id*.].  Twice the Bank identifies the communication as an "offer" or an abbreviation of "offer" ("counter" of course, being short for "counter-offer").  "Offer" is a term with a very specific meaning in contract law.  "A valid offer . . . creates a power of acceptance in the offeree."  17A Am. Jur. 2d *Contracts* § 45 (2011).  By identifying his communication as an "offer," counsel for the Bank was manifesting his intent to be bound by the terms contained therein so long as the offeree, RTJ, accepted.  When RTJ did

5

accept, then the Bank was bound to the terms contained in the email.

The facts are very similar to those of a recent case arising in the Middle District of Tennessee. In that case, "[t]he Defendant sent an offer in an email containing the material terms of the agreement, stating that upon Plaintiff's acceptance of this offer, a written settlement agreement would then be drafted within a few days containing the material terms and 'general boilerplate language.'" *Burgess v. Bank of America*, No. 3:09-00737, 2009 WL 407844, at *2 (M.D. Tenn. Nov. 23, 2009). After acceptance, one of the parties tried to back out of the agreement before the written settlement was completed. The court enforced the agreement, finding that the email was a valid offer even though it contained language showing the offeror's desire to create a written memorialization at a later time. *See id*. at *2-3. This is essentially the same situation as the current one, and just as the parties were bound in *Burgess*, so shall they be bound here where there is clear language identifying a communication as an "offer" and a lack of "positive agreement" that the parties will not be bound until a more formal memorialization.

## B.

Having concluded that mutual assent existed, the Court must now interpret the contract and the terms contained within it. *See Frear v. P.T.A. Industries, Inc.*, 103 S.W.3d 99, 105 (Ky. 2003) ("[T]he construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court"). The Bank makes a great deal of the communications between the parties that occurred *after* the September 19 RTJ acceptance. But the Court need only examine these communications if an ambiguity exists in the agreement. In *Frear*, the Kentucky Supreme Court laid out quite clearly the proper analytical framework for those interpreting Kentucky contract law in circumstances such as this.

First, a court "must determine whether the terms of the parties' settlement agreement are

ambiguous." *Id*. at 105-06.  Only if an ambiguity exists should a court consider the importance

of extrinsic evidence like that which the Bank seeks to rely on.  A court would do this in an

attempt to ascertain the intent of the parties because of the ambiguity in the agreement itself.  No

such analysis is necessary if an ambiguity is not present in the agreement.  Instead, the agreement

should "be enforced strictly according to its terms and a court will interpret the contract's terms

by assigning language its ordinary meaning and without resort to extrinsic evidence." *Id*. at 106

(citations omitted).  Thus, determining whether an ambiguity exists is essential to the analysis.

"An ambiguous contract is one capable of more than one different, reasonable

interpretation." *Central Bank & Trust Co. v. Kincaid*, 617 S.W.2d 32, 33 (Ky. 1981).  The

contract provision at issue is contained in part 2 of the Bank's September 16 email: "outstanding

notes and accounts receivable of RTJ."  The Bank contends that because both parties were

commercial lenders who had dealt with each other previously that they both "knew . . . and

understood that 'accounts' meant accounts in all forms, including proceeds generated from the

accounts." [R. 59 at 9].  RTJ disagrees of course, arguing that there is no ambiguity and that

"[t]he Settlement Agreement does not state that the Plaintiffs will pay the Bank all proceeds that

they collected in accounts receivable.  Pursuant to the terms of the agreement, the Plaintiffs are

not required to pay the Bank past amounts collected from the accounts receivable."  [R. 58 at 3].

Unfortunately for the Bank, the phrase "outstanding notes and accounts receivable" is not

so malleable that its definition could reasonably stretch to include proceeds collected from

previously unpaid, but now paid, bills. It is simply not the type of phrase that is "capable of more

than one different, reasonable interpretation." *Central Bank & Trust Co*., 617 S.W.2d at 33.

"Account Receivable" is defined as "[a]n account reflecting a balance owed by a debtor; a debt

owed by a customer to an enterprise for goods or services."  Black's Law Dictionary (9th ed.

2009).  "Outstanding" is defined as "[u]npaid; uncollected."  Black's Law Dictionary (9th ed. 2009).  The key terms in these definitions are "balance owed," "unpaid," and "uncollected."  Thus, the only reasonable interpretation of the phrase "outstanding notes and accounts receivable" is accounts that have balances owed on them still.  The value in those accounts is the right to future payment.  Once payment is received, the note is no longer "outstanding" or a "receivable."  Instead, it becomes some other asset, most likely cash.

The Bank attempts to identify the definitions section of the security agreement as support for its position that the term "accounts receivable" included "proceeds generated from the accounts."  [R. 59 at 9].  The Bank argues that "[t]he term 'accounts' was broadly defined in the Loan and Security Agreement" to fit its interpretation.  [R. 59 at 12].  A review of the security agreement contradicts this argument. The broad definition relied on by the Bank is actually the definition of "collateral," not "accounts."  [*See* R.60-3 at 1].  While the definition for "collateral" includes references to "accounts," the actual phrase "accounts" is not defined in the security agreement.  As a result, the terms "accounts receivable" and "outstanding" should be given their ordinary meaning as outlined above.  Doing so, the Court must conclude that there is no ambiguity.

Under *Frear*, once a court determines that no ambiguity exists, it assigns the "language its ordinary meaning without resorting to extrinsic evidence."  *Frear*, 103 S.W.3d at 106.  Having already concluded that no ambiguity exists because the terms in the contract are not capable of more than one reasonable interpretation, it is simple to interpret the contract so that the terms represent that one reasonable interpretation.  Thus, the Court must hold that "all outstanding notes and accounts receivable of RTJ" as used in "2" of the Bank's offer means nothing more than money owed to RTJ on its various notes and accounts on the date of the offer.

This is the sole asset the Bank acquired a right to under the plain meaning of the terms contained in the disputed portion of the settlement contract. [R. 58, Ex. A].

**IV.**

For the reasons above, it is hereby **ORDERED** as follows:

1.  Plaintiffs' motion for order enforcing settlement [R. 58] is **GRANTED**. A valid and enforceable settlement as outlined in Plaintiffs' motion [R. 58] exists;

2.  In that settlement, the term "all outstanding notes and accounts receivable of RTJ" means "money owed to RTJ on its various notes and accounts on the date of the offer."

3.  Defendant's motion for settlement [R. 60] is **DENIED**;

4.  The pretrial conference scheduled for Tuesday, January 17, 2012 and trial scheduled for Monday, January 30, 2012 are both **CANCELED** as they are no longer necessary.

This, the 12th day of January, 2012.

**Signed By:**

*Gregory F. Van Tatenhove*

**United States District Judge**